# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN M. GRADY, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiffs<br><br>　　vs.<br><br>CREDIT SUISSE GROUP, WALTER B. KIELHOLZ, HANS-ULRICH DOERIG, BRADY W. DOUGAN and RENATO FASSBIND,<br><br>　　　　　　Defendants. | <u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

RECEIVED

MAY 30 2008

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, John M. Grady ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' press releases, Securities and Exchange Commission ("SEC") filings by Credit Suisse Group ("Credit Suisse" or the "Company") and media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of Plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired Credit Suisse American Depositary Receipts ("ADRs") (the "Class") during the period February 15, 2007 through February 19, 2008 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, certain officers and directors of Credit Suisse entered into a manipulative scheme to defraud investors.  Specifically, defendants issued materially false and misleading statements regarding the Company's risk profile and financial results.  Defendants concealed the Company's failure to write down impaired Collateralized Debt Obligations ("CDOs") and mortgage-backed securities.  As a result of defendants' scheme, Credit Suisse ADRs traded at artificially inflated prices during the Class Period, reaching a high of $79.29 per share in April 2007.

3.      Through their false and misleading statements, defendants created the appearance that Credit Suisse had emerged relatively unscathed by the near-collapse of the subprime mortgage securities market, unlike its rival UBS AG, which had acknowledged large exposure and had taken equally large write-downs.  This façade began to crumble in early November 2007.

4.     On November 1, 2007, the Company shocked investors when it reported its third quarter net income fell 31% to CHF 1.3 billion (Swiss francs), or $1.1 billion, attributing the loss to "extreme market conditions" and credit market swings that caused write-downs of $1.9 billion.

5.     Upon this revelation, the Company's shares declined from $67.70 to $61.75 per ADR over the next three trading days, on heavy volume.

6.     However, the extent of the Company's exposure had yet to be revealed.  Over the subsequent four months, defendants' fraudulent scheme unraveled as new information entered into the market related to the Company's mismarking of debt securities – culminating in the announcement of an additional $2.85 billion write-down.  On February 20, 2008, the *Wall Street Journal* in an article entitled "Credit Suisse's Surprise," reported, in relevant part:

> Just last week, executives at Credit Suisse Group were patting themselves on the back for reporting fairly good results for 2007 and navigating the global credit crisis largely unscathed. ***Now, the Swiss bank has become the latest to disappoint Wall Street, announcing a surprise $2.85 billion hit from trades gone wrong.***
>
> \*     \*     \*
>
> ***In an announcement that sent its American depositary shares down 5.2%, the bank said the loss -- related to incorrect values its traders put on certain complex debt securities and to the falling market value of securities -- would lower its first-quarter profit by $1 billion. The bank suspended a handful of traders, and people familiar with the situation said they included the head of a London unit that specialized in debt pools known as collateralized debt obligations, or CDOs. The bank is still assessing whether the problem will force it to restate its 2007 results.***
>
> The mispricing of securities is a serious issue that has increasingly attracted the attention of U.S. and European regulators. In the U.S., federal prosecutors and securities regulators are examining the ways in which firms such as Merrill Lynch & Co. and UBS AG valued subprime-mortgage securities. Credit Suisse said it had notified regulators about its problems. A spokesman for the Swiss banking commission said the body had been informed by Credit Suisse but declined to comment further pending a more thorough investigation.
>
> The nature of the $2.85 billion write-down forebodes a difficult first quarter for banks, which many investors had hoped would be able to put credit-related losses behind them with their 2007 earnings.

7.    At the same time, it was revealed that the nearly $3 billion write-down was not

exactly voluntary.  A February 19, 2008 *Fortune* article reported, in relevant part:

> New York (Fortune) -- Credit Suisse's stunning announcement that it is taking a
> $2.85 billion charge because it failed to properly value some bonds is a major
> black eye for a firm that has not been shy in touting its success in avoiding the
> pitfalls that have befallen its competitors.
>
> According to sources inside and outside the firm, Credit Suisse's pricing errors
> centered on a portfolio of collateralized debt obligations owned by the firm's
> London securitized product trading desk.
>
> In discussing the debacle, Credit Suisse (CS) used the word "mismark," and has
> suspended (with pay) the traders it claims are responsible, but the difference in
> valuations on asset-backed securities CDOs appears at this point not to have been
> intentional, according to sources inside the bank.
>
> Sources told Fortune that the losses were taken in a proprietary trading account - a
> so-called back-book in trader parlance - where Credit Suisse was betting its own
> funds, as opposed to a regular trading account, which would be used to hold
> bonds prior to sale to customers.
>
> The pending close of a $2 billion bond offering may have helped push Credit
> Suisse to disclose the loss.
>
> The securities in question are said by bank sources and clients to be in the so-
> called super-senior tranches of ABS CDOs, where price declines of upwards of 50
> cents on the dollar or more in the past quarter have become standard. Fortune
> could not find out the size of the CDO portfolio.
>
> Apparently, according to sources at Credit Suisse, in an otherwise routine post-
> quarter review, Credit Suisse's auditors at KPMG questioned the trading desk's
> valuation methodology. One aspect of the current CDO market that almost
> certainly hurt CS are the wide bid-offer spreads of the CDO tranches in question,
> often more than 20 or 30 points. This is taken as a clear indication of not only
> poor liquidity in the market, but a sharp difference in opinion over valuation. It
> also invites the opportunity for a sharply favorable, if unwarranted, valuation.
>
> *        *        *
>
> The revaluation will forced Credit Suisse to cut its profit by $1 billion. Last week,
> the bank reported earnings of $7.8 billion from continuing operations for the year,
> a modest decline of only 3% from last year given the calamities in the global
> credit markets. In fact, there has been no shortage of ink spilled touting the bank's
> remarkable transformation into a nimble, risk-managing focused operation from

its legacy of being at the center of most every financial crisis in recent financial history.

8.     In response to this announcement and the other partial disclosures beginning in November 1, 2007, Credit Suisse ADRs declined from $67.70 to $48.22, or 28.8% - or more than 38% from their Class Period high.

9.     Leading up to the November 1, 2007 disclosure and extending through the end of the Class Period, defendants made false statements and/or failed to disclose material adverse facts known to them but concealed from the investing public.  Specifically, defendants falsely reported or failed to disclose the following:

    a.   The Company failed to properly report losses caused by the deterioration in its subprime mortgage-backed securities and CDOs;

    b.   Credit Suisse's internal controls were inadequate to ensure that CDOs and mortgage-backed securities were properly valued; and

    c.   Credit Suisse set aside inadequate provisions for its CDO and mortgage-backed securities investments, thereby inflating the Company's earnings;

    d.   The Company falsely reported that its financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

10.    As a result, the Company's financial statements during the Class Period were materially false and misleading.  Because of defendants' wrongful acts and omissions and the resultant sharp decline in the value of the Company's ADRs, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    Jurisdiction is conferred by §27 of the Securities Exchange Act (the "Exchange Act" or the "Act").  The claims asserted herein arise under §§10(b) and 20(a) of the Act and Rule 10b-5.

This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Act.

12.      Venue is proper in this District pursuant to §27 of the Act and 28 U.S.C. §1391(b). Credit Suisse is a Swiss corporation.  As such, pursuant to 28 U.S.C. §1391(d), Credit Suisse may be sued in any District of the United States.  Credit Suisse has sufficient minimum contacts with the Southern District of New York because Credit Suisse ADRs are traded on the New York Stock Exchange ("NYSE"), many of the false and misleading statements were made in or issued from this District, Credit Suisse has offices in this District and many of the acts and transactions giving rise to the violations of law complained of occurred here.

13.      In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

14.      Plaintiff John M. Grady resides in Chicago, Illinois.  Plaintiff purchased Credit Suisse ADRs on the NYSE at prices that were artificially inflated as a result of Defendants' fraud during the Class Period.  Plaintiff was damaged as the truth became revealed, and the artificial inflation was removed from the ADR price.  Plaintiff's purchases, sales and losses are set forth in the accompanying certification, which is incorporated by reference herein.

15.      Credit Suisse Group is a global financial services company offering services to corporate, institutional and government clients and high-net-worth individuals.  On January 1, 2006, it reorganized to form a fully integrated global bank, with three segments: Investment Banking, Private Banking and Asset Management.  Credit Suisse is based in Zurich, Switzerland and has offices located internationally, including in the United States.  The Company's ADRs are listed on the New York Stock Exchange.

16.    Defendant Walter B. Kielholz ("Kielholz") is, and at all relevant times was, Chairman of the Board of Credit Suisse.

17.    Defendant Hans-Ulrich Doerig ("Doerig") is, and at all relevant times was, Vice Chairman of the Board of Directors of Credit Suisse.

18.    Defendant Brady W. Dougan ("Dougan") is, and at all relevant times was, a director of Credit Suisse, and since May 2007 has served as CEO of the Company.

19.    Defendant Renato Fassbind ("Fassbind") is, and at all relevant times was, Chief Financial Officer ("CFO") of Credit Suisse.

20.    Defendants Kielholz, Doerig, Dougan and Fassbind are referred to herein collectively as the "Individual Defendants." The Individual Defendants possessed the power and authority to control the contents of Credit Suisse's financial reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

21.    Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the affirmative representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as each was either made by the particular Individual Defendants or were "group-published" information, the result of the collective actions of the Individual Defendants.

## ALLEGATIONS

22.    On February 15, 2007, Credit Suisse announced its financial results for its fiscal year

ended December 31, 2006 and fourth quarter 2006. This report stated, in relevant part:

**Credit Suisse Group Reports Net Income of CHF 11.3 Billion for 2006**

Credit Suisse Group today reported net income of CHF 11,327 million for the full year 2006, up 94% compared to net income of CHF 5,850 million for 2005. Net income for 2006 included a net capital gain of CHF 1,817 million from the sale of Winterthur, which was recorded in the fourth quarter.

Basic earnings per share from continuing operations were CHF 7.53 for the full year 2006, compared to CHF 3.98 for 2005. Basic earnings per share were CHF 10.30 for the full year 2006, compared to CHF 5.17 for 2005.

Fourth-quarter 2006 net income totaled CHF 4,673 million, compared to net income of CHF 1,103 million in the fourth quarter of 2005.

**Credit Suisse recorded net new assets of CHF 95.4 billion for the full year 2006.**

Zurich, February 15, 2007 "2006 was a record year for Credit Suisse. Our integrated banking model proved successful and provided us with an effective platform to capture the growth opportunities arising from high levels of client activity, while at the same time significantly improving our profitability," stated Oswald J. Grübel, CEO of Credit Suisse.

He added: "In our first year as an integrated bank, we have made excellent progress in strengthening our operating efficiency but there is still great potential for further improvement as we continue to invest in the growth of our business."

He concluded: "Our clients have responded well to our integrated approach and Credit Suisse now has excellent opportunities for further growth in the context of globalization, which we believe will create dynamic markets for the foreseeable future."

*Investment Banking reported record income from continuing operations before taxes of CHF 2,342 million in the fourth quarter of 2006, an increase of CHF 2,056 million, compared to the fourth quarter of 2005.* These results reflected strong performance across all key business areas and regions amid favorable market conditions, high levels of deal activity and improved market share in certain products. The weakening of the average rate of the US dollar against the Swiss franc from the fourth quarter of 2005 adversely affected revenues and favorably impacted expenses.

For the full year 2006, Investment Banking reported income from continuing operations before taxes of CHF 5,951 million, an increase of CHF 4,352 million compared to the full year 2005. Excluding the CHF 508 million of credits from insurance settlements for litigation and related costs in 2006 and the CHF 960

million charge to increase litigation reserves in 2005, income from continuing operations before taxes for the full year 2006 increased 113% compared to the full year 2005.

Investment Banking's progress in implementing its strategy to deliver a more profitable franchise positioned it to capitalize on favorable market conditions prevalent during 2006. Consequently, Investment Banking was able to achieve a number of its financial objectives set out in December 2004 and continues to make incremental progress in other areas of its strategy. For the full year 2006, Investment Banking delivered strong revenue growth and began to make progress on cost management initiatives.

Investment Banking will continue to build upon its existing strong franchises, including the emerging markets, leveraged finance and mortgage businesses. In 2006, Credit Suisse maintained its leading position in some of the fastest growing emerging markets, including China, Russia, Brazil and Mexico. The acquisition of Hedging-Griffo is expected to complement Credit Suisse's position as a premier investment bank in Brazil. In addition, Investment Banking will continue to grow businesses where there are gaps to peers, such as prime services, commodities and derivatives, with an aim to further diversify its revenue mix and reduce earnings volatility. With this foundation in place, Investment Banking is well positioned to leverage revenue synergies obtained through the integrated bank, with a strong focus on delivering solutions and support to Private Banking and Asset Management clients.

In the fourth quarter of 2006, pre-tax income margin was 38.5%, and pre-tax return on average economic risk capital was 58.2%, compared to 7.7% and 10.8%, respectively, in the fourth quarter of 2005. For the full year 2006, pre-tax income margin was 29.1%, and pre-tax return on average economic risk capital was 40.3%. Excluding the insurance settlements, pre-tax income margin for the full year 2006 was 26.6%, and pre-tax return on average economic risk capital was 37.1%.

Net revenues were a record CHF 6,085 million, up CHF 2,350 million, or 63%, in the fourth quarter of 2006 compared to the fourth quarter of 2005, reflecting strong performance in both the investment banking and trading businesses. This revenue growth was well diversified, spread across most product classes and regions. In US dollar terms, net revenues were up 75%, compared to the fourth quarter of 2005. For the full year 2006, net revenues were CHF 20,469 million, up CHF 4,922 million, or 32%, compared to the full year 2005.

***Provisions for credit losses were CHF 20 million in the fourth quarter of 2006, compared to a net release of CHF 13 million in the fourth quarter of 2005. Compared to September 30, 2006, total impaired loans decreased CHF 65 million to CHF 188 million,*** and valuation allowances as a percentage of total impaired loans increased 35 percentage points to 136% as of December 31, 2006. ***The overall credit environment continued to be favorable in the fourth quarter***

*of 2006. While the credit environment is likely to remain favorable in the near term, the very benign credit environment is not expected to continue, which may result in a modest increase in net new provision levels towards the end of 2007.*
[Emphasis added]

23.    On March 26, 2007, Credit Suisse filed its report for the fiscal year 2006 and fourth

quarter 2006 with the SEC on Form 20-F.  This release stated, in relevant part:

Critical accounting policies

In order to prepare the consolidated financial statements in accordance with US GAAP, management is required to make certain accounting estimates to ascertain the value of assets and liabilities. These estimates are based upon judgment and the information available at the time, and actual results may differ materially from these estimates. Management believes that the estimates and assumptions used in the preparation of the consolidated financial statements are prudent, reasonable and consistently applied. For further information on significant accounting policies and new accounting pronouncements, see note 1 "Summary of significant accounting policies" and note 2 "Recently issued accounting standards" in the Notes to the consolidated financial statements in the Credit Suisse Group Annual Report 2006.

The Group believes that the critical accounting policies discussed below involve the most complex judgments and assessments.

Fair value

The fair value of the majority of the Group's financial instruments is based on quoted market prices in active markets or observable market parameters or is derived from such prices or parameters. These instruments include government and agency securities, commercial paper, most investment-grade corporate debt, most high-yield debt securities, exchange traded and certain OTC derivative instruments, most Collateralized debt obligations (CDO), most mortgage-backed and asset-backed securities, certain residential mortgage whole loans and listed equity securities.

In addition, the Group holds financial instruments that are thinly traded or for which no market prices are available, and which have little or no price transparency. For these instruments, the determination of fair value requires subjective assessment and varying degrees of judgment depending on liquidity, concentration, pricing assumptions and the risks affecting the specific instrument. *In such circumstances, valuation is determined based on management's best estimate of fair value. These instruments include certain investment-grade corporate debt securities, certain high-yield debt securities, distressed debt securities, certain CDOs, certain OTC derivatives, certain mortgage-backed and asset-backed securities, non-traded equity securities and private equity and other long-term investments. Valuation techniques for certain of these*

*instruments are described more fully below.*

 Controls over the fair valuation process

*Control processes are applied to ensure that the fair value of the financial instruments reported in the consolidated financial statements, including those derived from pricing models, are appropriate and determined on a reasonable basis. The Group determines fair value using observable market prices or market-based parameters whenever possible. In the absence of observable market prices or market-based parameters in an active market, observable prices or market-based parameters of comparable market transactions or other observable data supporting an estimation of fair value using a valuation model at the inception of a contract, fair value is based on the transaction price. Control processes are designed to assure that the valuation approach is appropriate and the assumptions are reasonable.*

*These control processes include the review and approval of new instruments, review of profit and loss at regular intervals, risk monitoring and review, price verification procedures and reviews of models used to estimate the fair value of financial instruments by senior management and personnel with relevant expertise who are independent of the trading and investment functions.*

The Group also has agreements with certain counterparties to exchange collateral based on the fair value of derivatives contracts. Through this process, one or both parties provide the other party with the fair value of these derivatives contracts in order to determine the amount of collateral required. This exchange of information provides additional support for valuation of certain derivatives contracts. The Group and other participants in the OTC derivatives market provide pricing information to aggregation services that compile this data and provide this information to subscribers. This information is considered in the determination of fair value for certain OTC derivatives.

24.    On May 3, 2007, the Company filed its results for the first quarter of 2007 on Form 6-

K.  In the 6-K, the Company discussed the results for its Investment Banking segment, in relevant

part:

*During 1Q07, we continued to deliver strong results amid high market volatility in certain areas and a more challenging fixed income trading environment. We delivered record revenues with modest additional risks. Net income from continuing operations before taxes was CHF 1,990 million.*

\*    \*    \*

Results summary

In 1Q07, income from continuing operations before taxes was CHF 1,990 million,

up CHF 426 million, or 27%, compared to 1Q06. Net revenues were a record CHF 6,582 million, up CHF 825 million, or 14%, with increases in all major business areas. Total operating expenses were CHF 4,531 million, up CHF 283 million, or 7%, primarily from higher performance-related compensation expenses reflecting higher revenues. The weakening of the average rate of the US dollar against the Swiss franc by 5% from 1Q06 adversely affected the revenue comparison and favorably impacted the expense comparison.

Compared to the strong 4Q06, income from continuing operations before taxes declined CHF 352 million, or 15%. Net revenues were up CHF 497 million, or 8%, driven by debt underwriting, equity trading and corporate lending activities (included in other revenues), partly offset by lower revenues from equity underwriting and advisory and other fees. Total operating expenses were up CHF 808 million, or 22%, due primarily to higher compensation expenses reflecting both higher revenues and a higher compensation accrual rate in 1Q07 compared to 4Q06.

Overall, we had a good start to the year, achieving record quarterly revenues in our debt underwriting, equity and fixed income trading businesses. Additionally, we benefited from our strong position in credit businesses, including leveraged finance, emerging markets and high grade debt markets. Higher equity trading results were driven by our equity proprietary and cash businesses. ***The adverse impact from the dislocation of the US sub-prime mortgage market was contained, and the resulting lower revenues in our residential mortgage-backed securities and asset–backed securities businesses were more than offset by strong revenues in other areas in our fixed income business.***

We continue to make progress on our cost management initiatives, as general and administrative expenses declined despite increased revenues. Our focus on fixed costs has enabled us to achieve a lower run-rate in the first quarter compared to the fourth quarter of 2006. This reduction in our fixed cost run-rate has been achieved despite growth in volumes and higher activity.

\*       \*       \*

Provision for credit losses

YoY: Up from CHF (55) million to CHF 61 million

The increase is due primarily to additional reserves related to emerging markets loan portfolio growth. While the overall credit environment remained stable in the quarter, the benign credit environment is not expected to continue, which may result in a modest increase in new provision levels towards the end of 2007.

QoQ: Up from CHF 20 million to CHF 61 million

The increase is due primarily to additional reserves related to emerging markets

loan portfolio growth. [Emphasis added]

     25.    On August 3, 2007, the Company filed its results for the second quarter of 2007 on

Form 6-K.  In the 6-K, the Company discussed the results for its Investment Banking segment, in

relevant part:

**Investment Banking**

***During 2Q07, we continued to deliver strong results amid higher market volatility and a more challenging fixed income trading environment. We delivered record revenues with continued disciplined risk management. Income from continuing operations before taxes was a record CHF 2,502 million.***

\*      \*      \*

Operating environment

The operating environment was generally positive for Investment Banking during 2Q07. We benefited from favorable equity markets, which trended higher, and from increased trading volumes and higher volatility. The volume of global equity new issuances set a record in 2Q07, as did the volume of announced global mergers and acquisitions transactions, driven largely by cross-border and financial sponsor activity. ***The fixed income markets were generally challenging, but offered attractive trading opportunities despite the dislocation of the US subprime mortgage market as of the end of 1Q07, the effects of which carried over into 2Q07.*** Rate products experienced a more volatile rate environment due to uncertainty over the direction of interest rates. Credit markets remained generally positive with increased new issue activity, although with a heightened focus on underlying issuer credit quality. In the commercial mortgage markets, demand and liquidity remained strong. In the residential mortgage market, our issuance levels were down due to continued subprime concerns.

Results summary

In 2Q07, income from continuing operations before taxes was a record CHF 2,502 million, up CHF 1,215 million, or 94%, compared to 2Q06. Excluding the credits from insurance settlements for litigation and related costs of CHF 474 million in 2Q06, income from continuing operations before taxes increased CHF 1,689 million, or 208%. Net revenues were a record CHF 7,538 million, up CHF 3,102 million, or 70%, with substantial increases in all major business areas. Total operating expenses were CHF 5,027 million, up CHF 1,894 million, or 60%, primarily from higher compensation expenses, reflecting higher revenues, and higher other operating expenses, as 2Q06 included the credits from insurance settlements. Excluding these credits from insurance settlements, other operating expenses were CHF 88 million, or 7%, lower.

Compared to 1Q07, income from continuing operations before taxes increased CHF 512 million, or 26%. Net revenues were up CHF 956 million, or 15%, driven by increases in most of our major business areas. Total operating expenses were up CHF 496 million, or 11%, due primarily to higher compensation expenses reflecting higher revenues.

Overall, we had a strong quarter, with record quarterly revenues in our equity and fixed income trading businesses. Our equity trading results were driven by very good performance in our cash, proprietary trading, derivatives and prime services businesses. ***Our fixed income trading results were strong despite the challenging market environment, including the impact of the dislocation in the US subprime mortgage market. Fixed income results were driven by our structured products, including commercial mortgage-backed securities, leveraged finance, emerging markets trading and currency trading businesses. Our debt underwriting revenues remained strong, driven by our leveraged finance franchise, which benefited from active markets, and was supported by our strong client relationships with financial sponsors.***

***We continued to make progress on our cost management initiatives, as general and administrative expenses remained flat compared to 1Q07, despite increased revenues. Compared to 2Q06, general and administrative expenses declined CHF 131 million, or 14%, excluding the impact of the credits from insurance settlements in 2Q06. This decline reflected a lower fixed cost run-rate despite increased business activity.***

\*      \*      \*

Provision for credit losses

YoY: Down 44% from CHF 16 million to CHF 9 million

***The decrease reflected the continued stable credit environment in 2Q07. The benign credit environment is not expected to continue, which may result in a modest increase in new provision levels toward the end of 2007.***

QoQ: Down 85% from CHF 61 million to CHF 9 million

***The decrease was due primarily to increased reserves in 1Q07 related to the emerging markets loan portfolio.*** [Emphasis added]

26.     On August 28, 2007, Credit Suisse was issued a letter by the SEC commenting on the Company's February 15, 2007 annual report.  In the letter the SEC questioned the adequacy of the Company's disclosures regarding its subprime mortgage securitizations, stating, in relevant part:

Subprime lending

3. We note from the disclosures in your risk factors, operating environment and competition, and operating and financial review discussions that you have interests in what are commonly referred to as "subprime" residential mortgages.

\*       \*       \*

***Based on your current public disclosures, it is possible that more clarity about your exposure to subprime loans could be helpful. Regardless of the materiality of your exposure, we respectfully request that you provide us with supplemental information about your involvement in subprime loans.***

\*       \*       \*

***If you believe that a material adverse impact on your financial condition, results of operations or liquidity, resulting from your involvement in subprime lending, is remote, please explain.*** If so, tell us what consideration you may give to a more transparent disclosure about this to inform readers of your level of involvement.

If you believe that a material adverse impact resulting from this exposure is reasonably possible, tell us what disclosures you may consider in order to provide a clearer understanding of this exposure. [Emphasis added]

27.    On September 26, 2007, Credit Suisse replied to the SEC letter on Form 6-K. In its

reply, the Company falsely minimized its exposure to loss for those investments:

The risk management philosophy employed by Credit Suisse when it purchases subprime loans originated by third parties for securitization is similar in many respects to that employed when it originates such loans on its own behalf In addition, the following should be noted:

Prior to purchasing subprime loans from a third party, Credit Suisse evaluates and approves such third party. Among other elements, we consider the following factors before approving each third party originator:

—    Length of time in the business;

—    Depth and breadth of senior management and related capabilities;

—    Financial statements;

—    Funding and distribution sources / arrangements and length and type of such arrangements;

—    Licenses maintained;

—    Policies and procedures employed by the originator to approve vendors;

source, underwrite, and close subprime loans; and manage its interest and credit-related exposure;

— Adequacy and existence of insurance;

— Systems used to manage its business;

— Quality control policies and procedures and the results thereof;

— Status and nature of threatened, pending and settled customer complaints and lawsuits;

— Status and nature of federal, state and local regulatory or financial examinations;

— Background searches on senior management; and

— Performance of subprime loans previously originated.

* Once an account is approved, the third party subprime loan originator is asked to execute agreements that will govern its business dealings with us. These agreements contain representations and warranties concerning the originator and the loans and related indemnities and other similar protections designed to mitigate our risks. Furthermore, substantially all of these agreements contain provisions that require the originator to repurchase certain subprime loans upon the occurrence of one or more events, each of which is designed to mitigate the risks we are exposed to in connection with this business.

* At the same time, exposure limits are established to limit the aggregate dollar amount of loans we may purchase at a particular time or over a particular period of time, in each case, from each third party subprime loan originator. These limits are intended to act as a proxy for each originator's ability to repurchase subprime loans when we identify the loans as deficient for one or more reasons enumerated in our agreements.

* *Credit Suisse performs a detailed due diligence review on the subprime loans purchased from approved third party subprime loan originators. The nature and extent of the review are substantially similar to that set forth above with respect to subprime loans originated by Credit Suisse. Similarly, the control systems described above are also applicable to the subprime loans purchased by us.*

* *Each third party subprime loan originator that is approved to do business with Credit Suisse is required to recertify its application annually. As a result, we are able to evaluate again the suitability of a subprime loan originator.*

* *We monitor the performance of the subprime loans purchased from these third party subprime loan originators from purchase through*

*securitization. The primary objectives of this ongoing monitoring and surveillance are to, among other things, evaluate the performance of the subprime loans acquired by us; evaluate the need to change and/or refine our due diligence practices described above; enforce our contractual rights; modify the types of subprime products purchased by us; and evaluate the suitability of third party subprime loan originators from which we purchase such loans.*

\*        \*        \*

As a result of originating and purchasing subprime loans, we are exposed to interest rate and credit risks. Our risk management regarding these risks is as follows:

\*        Under normal market conditions, interest rate risk is managed through a series of short (where we are long loans) and long (where we are short loans) positions in various securities and other instruments whose interest rate characteristics are expected to move inversely with the related subprime loans. The primary objective of this interest rate risk management is to, at all times under normal market conditions, be flat to the market. We do not seek to benefit from changes in interest rates in this line of business.

\*        Similarly, under normal market conditions, credit risk is managed by securitizing or selling the subprime loans we acquire promptly after acquisition. We do this through a series of forward sales/commitments and the creation of a securitization program that allows us to distribute the credit risk associated with the loans to the capital markets. *Further, when there is a default or other credit event in a subprime loan acquired by us in our ordinary course of business, we manage this risk through a series of controls including: a robust mark down policy; the strict enforcement of our contract rights, which may result in the originator repurchasing the loan; having the loans serviced by our affiliated loan servicing company; and our distribution strategy for such loans. We try to ensure that the loans we acquire are sufficiently liquid to allow us to distribute the credit risk (through loans sales and securitizations) concurrently with our acquisition or shortly thereafter and to manage the loans that are not sold or securitized as efficiently and quickly as possible.*

\*        When the residential subprime mortgage-backed securitization markets become dislocated, our primary risk management is to reduce the number of loans acquired, adjust the characteristics of the loans acquired to ensure that such loans are as liquid as possible given market conditions and, at the same time, distribute the remaining loans owned by us. *We have engaged in this strategy over the last several months of market dislocation and in doing so, have significantly reduced our risk*. In addition, when markets become significantly dislocated, we may look to enter into long and short

positions using various securities, indices and other instruments to manage our risks and potentially offset the reduction in revenues.

\*    \*    \*

***We believe that a material adverse impact on our financial condition, results of operations or liquidity resulting from our involvement in subprime lending is remote due to the reduction of our subprime residential mortgage loan exposures, our active management of our subprime risks and our economic hedging of such risks.*** [Emphasis added]

28.    The statements above were materially false and misleading when made or omitted material facts because: (1) The Company failed to properly record losses caused by the deterioration of its subprime mortgage-backed securities and CDOs; (2) Credit Suisse's internal controls were inadequate to ensure that losses on CDOs and mortgage-backed securities were properly valued; (3) Credit Suisse set aside inadequate provisions for its CDO and mortgage-backed securities investments, thereby inflating the Company's earnings; and (4) The Company falsely reported that its financial statements were prepared in accordance with GAAP.

## THE TRUTH IS REVEALED

29.    While defendants were repeatedly asserting to investors and regulators that a material adverse impact to the Company due to its subprime exposure was "remote," and that it had emerged relatively unscathed from the subprime meltdown, the Company's mounting losses were becoming too large to hide.

30.    The levee began to break when, on November 1, 2007, Credit Suisse announced third quarter 2007 results.  Delivering a mixed message, the Company's release stated, in relevant part:

Zurich, November 1, 2007 Credit Suisse Group today reported income from continuing operations and net income of CHF 1,302 million for the third quarter of 2007, reflecting lower results in Investment Banking and Asset Management. Private Banking remained strong, with significant increases in both income from continuing operations before taxes and net revenues compared to the third quarter of last year.

Brady W. Dougan, Chief Executive Officer of Credit Suisse Group, said: "***The***

- 17 -

*extreme market conditions that characterized the third quarter affected many of our businesses. However, our global diversification and balanced business mix helped us mitigate the impact on our overall performance, maintain solid profitability and deliver a record result for the first nine months of the year.*"

Commenting on the operating environment, Mr. Dougan continued: "We are seeing encouraging signs that activity in the credit markets is increasing, although it is too early to predict when all of the affected markets will return to more normal levels. The events of the third quarter have reaffirmed the importance of our integrated global model in driving revenues and enhancing efficiency throughout the entire market cycle."

*        *        *

Investment Banking

*Investment Banking reported income from continuing operations before taxes of CHF 6 million in the third quarter of 2007, down from CHF 758 million in the same period of 2006. Its performance was significantly affected by the dislocation in the structured products and credit markets, which led to a sharp downturn in results in fixed income. The structured products businesses, including residential and commercial mortgages and collateralized debt obligations (CDOs), recorded a valuation reduction of CHF 1.1 billion, net of fees and hedges.* Net revenues also reflected a valuation reduction of CHF 1.1 billion on leveraged loan commitments, net of fees and hedges. Lower fixed income trading results were partly offset by strong performances in interest products, life insurance finance and emerging markets trading. Lower equity trading results reflected a weak performance in proprietary trading, including a loss of approximately CHF 300 million in quantitative trading strategies, partly offset by strong results in the cash equities, equity derivatives and prime services businesses. Fixed income and equity trading also benefited from fair value gains of CHF 622 million due to the widening credit spreads on Credit Suisse debt. Total underwriting and advisory results were down, reflecting lower revenues in debt underwriting, partly offset by higher revenues in equity underwriting and advisory compared to the third quarter of 2006. [Emphasis added]

31.    On this news, Credit Suisse's ADRs declined to close at $63.01 per ADR on November 2, 2007, a loss of nearly 10%, from $69.61 per ADR in early October 2007, on high trading volume.

32.    Despite the loss, defendants continued to conceal the Company's losses in CDOs and mortgage-backed securities. A *Reuters* report read:

**Credit Suisse says CDO exposure "minimal vs peers"**

- 18 -

ZURICH, Nov 1 (Reuters) - Credit Suisse on Thursday said that its exposure to collateralised debt obligations remained minimal compared to peers, but declined to offer details.

"*We are not disclosing any number on those but I can tell you that they are minimal compared to some of our peers so we're pretty comfortable on our CDO's*," said Chief Financial Officer Renato Fassbind in an interview with broadcaster CNBC. [Emphasis added]

33.     Despite defendants' reluctance to concede the Company's subprime mortgage-related

losses, more information came to light when, on February 12, 2008, Credit Suisse announced its

results for the fourth quarter 2007 and fiscal year 2007 on Form 6-K.  This report stated, in relevant

part:

**2007 full-year and fourth-quarter results and business review**

Credit Suisse reported net income and record income from continuing operations of CHF 8,549 million in 2007. Net revenues were CHF 40,912 million in 2007, also a record. Diluted earnings per share from continuing operations were CHF 7.65 for 2007 compared to CHF 7.19 in 2006. Return on equity was 19.8% compared to 27.5% in 2006, which included substantial income from discontinued operations.

Fourth-quarter income from continuing operations was CHF 1,329 million, 49% lower than in the same period in the previous year, which benefited from favorable market conditions globally. Net income for the fourth quarter of 2007 was also CHF 1,329 million.

*In Investment Banking, pre-tax income for the full year was CHF 4,826 million. In the fourth quarter, pre-tax income was CHF 328 million, well below the same period in the previous year but above the previous quarter. Net revenues were CHF 3,918 million, 36% lower than the fourth quarter of 2006. Results reflected the impact of the credit market dislocation on our structured products and leveraged finance businesses, including net write-downs of CHF 1.3 billion. During the quarter we reduced our positions in these businesses.* We recorded strong results in other areas, including equity trading, interest rate products, fixed income proprietary trading and foreign exchange, reflecting the increasing diversification of our revenues.

*       *       *

Investment Banking

*During 4Q07, Investment Banking was profitable with income from continuing*

- 19 -

***operations before taxes of CHF 328 million. Net revenues were up from 3Q07, despite further valuation reductions in the structured products and leveraged finance businesses.*** Due to the challenging and volatile operating environment in the second half of the year, net revenues of CHF 20,135 million and income from continuing operations before taxes of CHF 4,826 million for 2007 declined from 2006 levels.

Results summary

In 4Q07, income from continuing operations before taxes was CHF 328 million, down CHF 2,014 million, or 86%, compared to a strong 4Q06. Net revenues were CHF 3,918 million, down CHF 2,167 million, or 36%, due in large part to the impact of the current credit market dislocations on our fixed income businesses, partly offset by strong equity trading revenues. Total operating expenses were CHF 3,380 million, down CHF 343 million, or 9%, due primarily to a decrease in compensation and benefits expenses reflecting lower net revenues and an increase in deferred share-based compensation for 2007.

Compared to 3Q07, income from continuing operations before taxes increased CHF 322 million. Net revenues were up CHF 1,821 million, or 87%, with higher revenues in several major business areas. Total operating expenses were up CHF 1,309 million, or 63%, due primarily to higher compensation and benefits expenses reflecting higher net revenues following a weak 3Q07.

Results in 4Q07 were negatively impacted by the continued dislocation in the structured products and credit markets, which led to significantly lower fixed income trading results compared to 4Q06, partly offset by strong performances in the interest rate products, fixed income proprietary trading and foreign exchange businesses.

Equity trading benefited from strong performances in the global cash, prime services and derivatives businesses. Equity proprietary trading recovered from losses in 3Q07 and had a profitable quarter. Fixed income and equity trading also benefited from fair value gains of CHF 489 million due to widening credit spreads on Credit Suisse debt. Our underwriting and advisory businesses had lower revenues compared to 4Q06, but improved compared to 3Q07.

***Provision for credit losses increased primarily due to higher provisions relating to a guarantee provided in a prior year to a third-party bank.***

For 2007, income from continuing operations before taxes was CHF 4,826 million, down CHF 1,125 million, or 19%, compared to 2006. Net revenues were CHF 20,135 million, down CHF 334 million, compared to 2006. We achieved higher revenues in equity trading, equity underwriting and advisory and other fees, but had significantly lower revenues in fixed income trading and debt underwriting, reflecting the severe market dislocations in the second half of 2007. Total operating expenses increased 3%, primarily reflecting credits from

insurance settlements for litigation and related costs of CHF 508 million in 2006. The weakening of the average rate of the US dollar against the Swiss franc adversely affected revenues and favorably impacted expenses. Net revenues were up 2% and total operating expenses were up 7% in US dollar terms.

Impact on results of the events in the mortgage and credit markets

In 4Q07, the continued dislocation in the structured products and credit markets led to significantly lower revenues in our leveraged finance and structured products businesses, including CMBS, residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDO). Our leveraged finance and structured products businesses had net valuation reductions of CHF 1,259 million and CHF 2,010 million in 4Q07 and 2007, respectively.

Leveraged Finance

Our leveraged finance business had net valuation reductions (including fees, hedges, interest on funded positions and recoveries) of CHF 231 million in 4Q07. Our gross valuation reductions (net of fees and terminations) were CHF 670 million. Our unfunded non-investment grade loan commitments (both leveraged loan and bridge) were CHF 25.3 billion (USD 22.4 billion) as of the end of 4Q07 versus CHF 52.3 billion (USD 44.7 billion) as of the end of 3Q07. Our funded non-investment grade loans (both leveraged loan and bridge) were CHF 10.7 billion (USD 9.5 billion) as of the end of 4Q07 versus CHF 6.3 billion (USD 5.4 billion) as of the end of 3Q07. The majority of our funded and unfunded loan commitments exposure is to large cap issuers with historically stable cash flows and substantial assets.

Leveraged finance revenues, including both origination and trading activities, totaled CHF 1.0 billion in 2007 compared to CHF 2.6 billion in 2006, reflecting the market dislocation in the second half of 2007.

Structured Products

Our CMBS business had net valuation reductions (including fees, hedges and interest on funded positions) of CHF 384 million in 4Q07. Our gross valuation reductions (net of fees) were CHF 737 million. Our CMBS origination gross exposure was CHF 25.9 billion (USD 22.9 billion) as of the end of 4Q07 versus CHF 35.9 billion (USD 30.7 billion) as of the end of 3Q07. The vast majority of our loans are secured by stable, high quality, income-producing real estate to a diverse range of borrowers in the US, Europe and Asia.

Our RMBS business had net valuation reductions (including fees, hedges and interest on funded positions) of CHF 480 million in 4Q07. Within our RMBS business, we had net US subprime exposure of CHF 1.6 billion (USD 1.4 billion) as of the end of 4Q07 versus CHF 3.9 billion (USD 3.3 billion) as of the end of 3Q07. Our other RMBS non-agency exposure was CHF 7.1 billion (USD 6.3

billion) as of the end of 4Q07 versus CHF 12.4 billion (USD 10.6 billion) as of the end of 3Q07. Of this amount, our US Alt-A exposure was CHF 2.8 billion (USD 2.5 billion) as of the end of 4Q07 versus CHF 7.0 billion (USD 6.0 billion) as of the end of 3Q07.

**Our asset-backed securities CDO origination, warehousing and synthetic businesses had net valuation reductions (including hedges) of CHF 164 million in 4Q07, net of the results from certain related trading activities. Our CDO business had net subprime exposure of CHF 2.7 billion (USD 2.4 billion) as of the end of 4Q07 versus CHF 2.3 billion (USD 2.0 billion) as of the end of 3Q07.**

Combined revenues from these and related structured products businesses totaled CHF 381 million in 2007 compared to CHF 3.1 billion in 2006.

*        *        *

Provision for credit losses

YoY: **Up from CHF 20 million to CHF 210 million**

**The increase was due primarily to higher provisions relating to a guarantee provided in a prior year to a third-party bank.**

QoQ: **Up from CHF 20 million to CHF 210 million**

**The increase was due primarily to the guarantee.** [Emphasis added]

34.    On February 19, 2008, the Company issued a release, filed with the SEC on Form 6-K, stating, in relevant part:

Media Release

Repricing of certain asset-backed positions

Zurich, February 19, 2008 **Further to its commitment to provide transparency, Credit Suisse today announced that in connection with the operation of ongoing control processes, it has undertaken an internal review that has resulted in the repricing of certain asset-backed positions in its Structured Credit Trading business within Investment Banking. The current total fair value reductions of these positions, which reflect significant adverse first quarter 2008 market developments, are estimated at approximately USD 2.85 billion (having an estimated net income impact of approximately USD 1.0 billion).** In the first quarter to date, we estimate we remain profitable after giving effect to these reductions. The final determination of these reductions will depend on further results of our review and continuing market developments. We will also assess whether any portion of these reductions could affect 2007 results. Finally, our

internal review, which has identified mismarkings and pricing errors by a small number of traders in certain positions in our Structured Credit Trading business, is continuing.

This disclosure is being made in connection with the closing, on February 19, 2008, of USD 2 billion 5.75% Subordinated Notes due 2018. [Emphasis added]

35.    Credit Suisse's "commitment to provide transparency" notwithstanding, the Company's auditor, KPMG, had refused to sign off on valuations made by Credit Suisse for the listing of a bond issue unless the Company made the February 19 announcement.

36.    In response to this announcement and the other partial disclosures beginning in November 1, 2007, Credit Suisse ADRs declined from $67.70 to $48.22, or 28.8%.

37.    As a result of defendants' false and misleading statements and omissions, Credit Suisse shares traded at inflated prices during the Class Period.  After the above revelations entered the market, massive sell-offs of the Company's ADRs ensued, sending their value down 38% from their most inflated Class Period pricing.

### FALSE AND MISLEADING STATEMENTS AND OMISSIONS

38.    The press releases and financial statements issued by Credit Suisse during the Class Period were false and misleading because defendants concealed its impaired mortgage-related assets, failed to set aside adequate loss provisions for them, thereby overstating earnings, and falsely represented that Credit Suisse fairly reported the Company's results of operations in accordance with GAAP.  Based on information available and known or recklessly disregarded by defendants at the time, impairments on the Company's CDOs and mortgage-backed securities should have been recognized and adequate provisions set aside.

39.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the

SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

40. Due to these accounting improprieties, the Company reported its financial results in a manner which violated GAAP, including the following fundamental accounting principles:

a. The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1);

b. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

c. The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

d. The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance

(FASB Statement of Concepts No. 1, ¶42);

        e.      The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

        f.      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

        g.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97); and

        h.      The principle that an estimated loss from a loss contingency "shall be accrued by a charge to income" if (i) "Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements", and (ii) "[t]he amount of loss can be reasonably estimated" (SFAS No. 5 ¶8).

      41.      Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

      42.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Credit Suisse

ADRs between February 15, 2007 and February 19, 2008, inclusive and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Credit Suisse ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct.

45.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by defendants' acts as alleged herein;

b.    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the financial performance, operations and management of Credit Suisse; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

47.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### LOSS CAUSATION/ECONOMIC DAMAGES

48.    Defendants' false and misleading statements and omissions had the intended effect and caused Credit Suisse ADRs to trade at artificially inflated levels throughout the Class Period.

49.    The decline in the price of Credit Suisse ADRs beginning on November 1, 2007 was the direct result of the unraveling of defendants' fraud as the truth was disclosed and was absorbed by the market.  The timing and magnitude of the Credit Suisse ADR price decline negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

### APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD-ON-THE-MARKET DOCTRINE

50.    At all relevant times, the market for Credit Suisse ADRs was an efficient market, for the following reasons, among others:

a.      Credit Suisse met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, Credit Suisse filed periodic public reports with the SEC; and

c.      Defendants regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

51. As a result of the foregoing, the market for Credit Suisse ADRs promptly assimilated current information regarding Credit Suisse from all publicly available sources and the assimilation of this information is reflected in the price of Credit Suisse ADRs. Under these circumstances, all persons who purchased or acquired the securities of Credit Suisse during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

52. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by executive officer(s) of Credit Suisse who knew that those statements were false when made.

## SCIENTER

53. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Suisse, their control over, and/or receipt and/or modification of Credit Suisse's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Credit Suisse, participated in the fraudulent scheme alleged herein.

54. Throughout the Class Period, the Individual Defendants were motivated to conceal material facts from investors because they were compensated, in large part, on the reported performance of Credit Suisse and its securities. As a result, in 2007, defendant Kielholz received CHF 14.6 million in compensation (approximately $14.2 million), defendant Doerig received CHF 5 million in compensation (approximately $4.9 million) and defendant Dougan received CHF 22.3 million in compensation (approximately $13.8 million). Furthermore, defendants sought to prove they could ably lead the recently reorganized Company to success and away from its reputation as "being at the center of most every financial crisis in recent financial history."

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

55. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other

members of the Class to purchase Credit Suisse's securities at artificially inflated prices and to suffer

losses when the truth was revealed and the price of the Company's ADRs dropped.  In furtherance of

this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

57.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements

not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a

fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially

high market prices for Credit Suisse's securities in violation of Section 10(b) of the Exchange Act

and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal

conduct charged herein or as controlling persons as alleged below.

58.    Defendants, individually and in concert, directly and indirectly, by the use, means or

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to make false statements and/or conceal adverse material information

about Credit Suisse's earnings and performance, as specified herein.

59.    The Defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Credit Suisse's value and performance

and continued substantial growth, which included the making of, or the participation in the making

of, untrue statements of material facts and omitting to state material facts necessary in order to make

the statements made about Credit Suisse and its performance and future prospects in light of the

circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit

upon the purchasers of Credit Suisse's securities during the Class Period.

60.    Each of the Individual Defendants' primary liability, and controlling person liability,

arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

61.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Credit Suisse's financial performance and risk profile from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's financial performance and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Credit Suisse's securities was artificially inflated during the Class Period.  In ignorance of the fact that market

prices of Credit Suisse's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Credit Suisse's securities during the Class Period at artificially high prices and were damaged thereby.

63.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Credit Suisse's actual financial performance and risk profile, which was not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Credit Suisse securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

64.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
**Violation of Section 20(a) of
The Exchange Act Against the Individual Defendants**

66.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.    The Individual Defendants acted as controlling persons of Credit Suisse within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

68.    The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70.    As set forth above, Credit Suisse and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed.R.Civ.P. 23;

B.    Awarding Plaintiff and other members of the Class compensatory damages;

C.      Awarding Plaintiff and other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

D.      Awarding Plaintiff and other members of the Class any other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 30, 2008

Respectfully submitted,
SCOTT + SCOTT LLP

By

BETH KASWAN (BK-0264)
29 West 57th Street, 14th Floor
New York, NY 10019
Tel: (212) 223-6444
Fax: (212) 223-6334
bkaswan@scott-scott.com

David R. Scott
108 Norwich Avenue
PO Box 192
Colchester, CT 06415
Tel: (860) 537-5537
Fax: (860) 537-4432
drscott@scott-scott.com

Arthur L. Shingler III
Hal D. Cunningham
600 B Street, Suite 1500
San Diego, California 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
ashingler@scott-scott.com
hcunningham@scott-scott.com

*Attorneys for Plaintiff*

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

_John M. GRADY TFEE_, ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and retains Scott + Scott, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in the **CREDIT SUISSE GROUP (CS)** security that is the subject of this action during the Class Period is/are as follows:

| No of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 1000 | Buy | 4-20-07 | 76.77 |
| 1000 | Buy | 8-2-07 | 67.65 |
| 1000 | Sell | 11-16-07 | 59.3308 |
| 1000 | Sell | 2-7-08 | 51.7072 |

5.    During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of _April_, 2008, at _Chicago Illinois_ (city, state).

Your Printed Name: _John M. Grady TFEE_

Signature: _John M. Grady TFEE_

Mailing Address: ██████████████

██████████████

██████████████

Telephone number: ██████████████

E-mail address: ██████████████